[Cite as *State v. Pate*, 2021-Ohio-1838.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28702 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-1019 |
| | : | |
| SCOTT E. PATE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 28th day of May, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JOHNNA M. SHIA, Atty. Reg. No. 0067685, P.O. Box 145, Springboro, Ohio 45066
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Scott E. Pate, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of ten counts of rape of a minor less than ten years of age, nine counts of gross sexual imposition, four counts of unlawful sexual conduct with a minor, and two counts of disseminating matter harmful to juveniles. In support of his appeal, Pate argues that the trial court erred by overruling his motion to sever offenses that were joined pursuant to Evid.R. 8(A). Pate also argues that the trial court erred by admitting two of the victims' video-recorded forensic interviews into evidence under the hearsay exceptions in Evid.R. 803(4) and Evid.R. 807(A). Pate further argues that his convictions for ten counts of rape of a minor less than ten years of age were not supported by sufficient evidence and were against the manifest weight of the evidence. Lastly, Pate argues that the State engaged in prosecutorial misconduct at his trial and that the cumulative effect of all the errors at trial warrants a reversal of his conviction. For the reasons outlined below, we find that all of Pate's claims lack merit, and we will therefore affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On May 1, 2019, a Montgomery County grand jury returned a 26-count indictment charging Pate with ten counts of rape of a minor less than ten years of age in violation of R.C. 2907.02(A)(1)(b); ten counts of gross sexual imposition (GSI) in violation of R.C. 2907.05(A)(4), four counts of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A), and two counts of disseminating matter harmful to juveniles in violation of R.C. 2907.31(A)(1). Each of the rape and gross sexual imposition counts included a sexually violent predator specification under R.C. 2941.148(A).

{¶ 3} The charges stemmed from allegations that Pate sexually abused four minors, A.A.1, A.A.2, A.A.3, and E.K. The indictment alleged that the sexual abuse of A.A.1, A.A.2, and A.A.3 occurred between March 1, 2016 and March 16, 2019. At the time the abuse was disclosed, A.A.1 was seven years old, A.A.2 was five years old, and A.A.3 was three years old. The indictment alleged that the sexual abuse of E.K. occurred between January 1, 2004 and April 24, 2004. E.K. was 13 years old at the time of the alleged abuse. The following table sets forth the charges pertaining to each of the four victims.

| Count | Victim | Offense | Allegation |
|-------|--------|---------|------------|
| 1 | A.A.1 | Rape < 10 | Digital-vaginal penetration in back room of Pate's residence |
| 2 | A.A.1 | GSI | Digital-vaginal contact in back room of Pate's residence (same incident as Count 1) |
| 3 | A.A.1 | Rape < 10 | Digital-vaginal penetration in front room of Pate's residence |
| 4 | A.A.1 | GSI | Digital-vaginal contact in front room of Pate's residence (same incident as Count 3) |
| 5 | A.A.1 | Rape < 10 | Cunnilingus in back room of Pate's residence |
| 6 | A.A.1 | Rape < 10 | Cunnilingus in Pate's vehicle |
| 7 | A.A.1 | Rape < 10 | Cunnilingus in front room of Pate's residence |
| 8 | A.A.1 | Rape < 10 | Fellatio in front room of Pate's residence |
| 9 | A.A.1 | GSI | Penile-vaginal contact in front room of Pate's residence |
| 10 | A.A.1 | GSI | Vaginal touching in Pate's vehicle |

| | | | |
|---|---|---|---|
| 11 | A.A.1 | GSI | Penile touching at Pate's residence |
| 12 | A.A.1 | GSI | Penile touching at Pate's residence |
| 13 | A.A.1 | GSI | Vaginal touching with an object in back room of Pate's residence |
| 14 | A.A.1 | Disseminating | Pornographic videos shown at Pate's residence |
| 15 | A.A.2 | Rape < 10 | Cunnilingus in front room of Pate's residence |
| 16 | A.A.2 | Rape < 10 | Cunnilingus in back room of Pate's residence |
| 17 | A.A.2 | Rape < 10 | Fellatio at Pate's residence |
| 18 | A.A.2 | Rape < 10 | Fellatio at Pate's residence |
| 19 | A.A.2 | GSI | Vaginal touching in front room of Pate's residence |
| 20 | A.A.2 | GSI | Vaginal touching in Pate's residence |
| 21 | A.A.2 | Disseminating | Pornographic videos shown at Pate's residence |
| 22 | A.A.3 | GSI | Digital-vaginal contact at Pate's residence |
| 23 | E.K. | Unlawful Sexual Conduct | Digital penetration |
| 24 | E.K. | Unlawful Sexual Conduct | Vaginal intercourse |
| 25 | E.K. | Unlawful Sexual Conduct | Fellatio |
| | | | |

| 26 | E.K. | Unlawful Sexual Conduct | Cunnilingus |
|----|------|-------------------------|-------------|

{¶ 4} Pate pled not guilty to the indicted charges and the matter ultimately proceeded to a jury trial on the 26 charges set forth above. Pate, however, elected to have a bench trial on the sexually violent predator specifications. Prior to those proceedings, the trial court conducted a voir dire examination to determine whether A.A.1 and A.A.2 were competent to testify at trial. Following this examination, the trial court determined that A.A.1, who was then eight years old, was competent to testify. The trial court determined, however, that A.A.2, who was then six years old, was not competent to testify. Having found that A.A.2 was not competent to testify at trial, and following an evidentiary hearing, the trial court determined that statements A.A.2 had made to her mother and to a forensic interviewer about the abuse were admissible hearsay under Evid.R. 807(A).

{¶ 5} Prior to trial, Pate filed a Crim.R. 14 motion to sever the charges related to A.A.1, A.A.2, and A.A.3 from the charges related to E.K. so that they could be tried separately. Although Pate conceded that all the charges were properly joined pursuant to Crim.R. 8(A), he argued that the 12 to 15-year lapse in time between the charges would cause the jury to have an unfavorable impression of him and would prejudice him at trial. Pate also argued that the allegations related to E.K. and the allegations related to A.A.1, A.A.2, and A.A.3 were so dissimilar that joinder served no valid evidentiary purpose. Pate further argued that the requested severance was appropriate because the evidence supporting the joined offenses would not be admissible at separate trials as other-acts

evidence under Evid.R. 404(B).

{¶ 6} The trial court disagreed with Pate and denied his motion to sever. In doing so, the trial court found that the evidence supporting the joined offenses was: (1) relevant; (2) admissible at separate trials as other-acts evidence under Evid.R. 404(B); and (3) had a probative value that outweighed the danger of unfair prejudice. The trial court further found that the charges and evidence were separate and distinct and that there was only a "scant likelihood of jury confusion." Order Denying Motion to Sever (Sep. 30, 2019).

{¶ 7} The State called several witnesses at Pate's jury trial. The witnesses included A.A.1; E.K.; the mother of A.A.1, A.A.2, and A.A.3; the law enforcement officers and experts who investigated the allegations of sexual abuse; and the medical and mental health service providers who examined and treated A.A.1 and A.A.2. Pate also called four relatives as defense witnesses. Pate called his wife, April Pate; his 19-year-old daughter, Belinda Pate; his 23-year-old son, Jonathan Pate; and his 25-year-old stepson, Ty Shyers. The following information was elicited at trial through the witnesses' testimony and other evidence.

*Pate's Relationship to A.A.1, A.A.2, and A.A.3*

{¶ 8} Pate's wife, April, was close friends with the maternal grandmother of A.A.1, A.A.2, and A.A.3. When the maternal grandmother passed away in 2012, April became very close to A.A.1, A.A.2 and A.A.3's mother ("Mother"). April and Mother became so close that April was present in the delivery room when A.A.2 and A.A.3 were born. Mother and her family spent a lot of time at the Pates' residence for cookouts, birthday celebrations, and holiday gatherings. Over time, April stepped into the role as

grandmother to A.A.1, A.A.2, and A.A.3.   The three girls referred to April as "Mammaw" and to Pate as "Pawpaw."

{¶ 9} Beginning in 2016, April and Pate would babysit A.A.1, A.A.2, and A.A.3 free of charge.   At 2:45 p.m. on Monday through Friday, Mother would drop off the three girls at the Pates' residence in Miamisburg, Montgomery County, Ohio.   The girls would stay at the Pates' residence until their father ("Father") picked them up sometime between 5 p.m. and 8 p.m.   Pate, who was unemployed, was oftentimes the only person at home when Mother dropped off the girls, and he would often babysit the girls when no one else was at home.   Pate also regularly picked up A.A.1 from elementary school during the school year.

{¶ 10} In addition to babysitting, the Pates allowed A.A.1 and A.A.2 to each spend one night of the week at their residence.   A.A.1 and A.A.2 would rarely spend the night at the same time.   A.A.3, who was still very young, never spent the night with the Pates. When A.A.1 or A.A.2 would spend the night, the child would either sleep in the bedroom belonging to Pate's daughter, Belinda, or on the couch in the living room.

*A.A.1's and A.A.2's Disclosure of Abuse and the Subsequent Investigation*

{¶ 11} On Saturday March 16, 2019, Mother was at home with A.A.1, A.A.2, and A.A.3 while Father was out getting maintenance performed on their vehicle.   As Mother was finishing cleaning her bedroom, five-year-old A.A.2 came into the room and looked at a license plate hanging on their wall that had a silhouette of a naked woman on it. A.A.2 pointed to silhouette and angrily told her Mother that: "Pawpaw needed to tell the truth."   Trial Trans. Vol. III, p. 542.   When Mother asked A.A.2 what she was talking

about, A.A.2 became dismissive. Mother, however, kept asking A.A.2 what she was talking about, and A.A.2 eventually told Mother that: "Pawpaw's trying to have sex with me and my * * * sisters." *Id.* Mother had never heard A.A.2 use the word "sex" before and did not ask A.A.2 what she thought the word meant. Mother instead asked how long Pate had been trying to have sex with her and her sisters. A.A.2 responded "for months," and then told Mother to ask A.A.1 about the abuse. *Id.* at 542-543.

{¶ 12} Mother then had A.A.2 leave the room and called seven-year-old A.A.1 into the room to speak with her privately. During this conversation, Mother asked A.A.1 if Pate had been touching her, to which A.A.1 responded "Yeah." *Id.* at 544. Mother did not elicit any more information from A.A.1 or A.A.2 until Father returned home, at which time Mother and Father spoke with A.A.1 alone. As part of that conversation, A.A.1 told Mother and Father that Pate was "licking on her." *Id.* at 546.

{¶ 13} At trial, Mother could not remember what else A.A.1 had told her during their conversation. However, Mother did recall reporting A.A.1's and A.A.2's allegations to the Miamisburg Police Department the following day, Sunday March 17, 2019, and providing the police with a written statement. Mother's written statement, which was admitted into evidence, described the circumstances surrounding A.A.2's disclosure and the information that Mother subsequently learned from speaking with A.A.1. Mother wrote in the statement that A.A.1 told her that Pate "had her go to their back room and touches on her privates when nobody is there" and "has rub[b]ed on her down there." State's Exhibit 1.

{¶ 14} After Mother completed her written statement, the investigating officer instructed Mother to take the girls to the hospital to be examined. Once at the hospital,

the sexual assault nurse examiner ("SANE nurse") examined A.A.1 and A.A.2. The examination did not uncover any visible, physical injuries to either girl. At trial, the SANE nurse testified that it is normal not to see any injuries because vaginal tissue is very pliant and heals quickly.

{¶ 15} The SANE nurse also performed rape-kit swabs on A.A.1's and A.A.2's mouths, fingernails, genitalia, buttocks, and the areas around their anuses. The swabs were then tested by a DNA forensic expert from the Miami Valley Regional Crime Lab. The expert testified that the test results did not uncover any male DNA or semen. The expert also testified that the results did not surprise her since it was reported that A.A.1. and A.A.2 had bathed and changed their clothing prior to the swabs being taken.

{¶ 16} The matter was thereafter referred to CARE House, which is an advocacy center for abused and neglected children in Montgomery County. A social worker for CARE House, Jennifer Knisley, conducted forensic interviews with A.A.1 and A.A.2 three days after they disclosed the abuse to Mother and Father.[1] During the forensic interviews, A.A.1 and A.A.2 made several additional disclosures. Among the disclosures were that Pate had touched A.A.1's and A.A.2's "privates" with his fingers going in circles, licked their privates, and put his "thing" in their mouths. State's Exhibit 5(A). A.A.1 also claimed that when Pate was changing A.A.3's diaper, she saw Pate touch A.A.3 with his fingers the same way that he had touched her. *Id.* A.A.1 further claimed that Pate touched her private with a blue "thing that you turn on" and "it starts squiggling around." *Id.* A.A.1 and A.A.2 both indicated that Pate showed them videos on his cell phone

---

[1] Knisley attempted to conduct an interview with A.A.3, but A.A.3 was too young and could not communicate.

depicting females performing oral sex on males, and that Pate made them do what was shown in the videos.  *Id.*

{¶ 17} Following the CARE House interviews, a search warrant was executed at Pate's residence.  During the search, officers collected Pate's cell phone and a blue vibrator located in a filing cabinet in Pate's bedroom.  When questioned by the investigating detective, Pate denied having any kind of vibrators in his home.  After the detective informed Pate that a blue vibrator was found in his filing cabinet, Pate indicated that it probably belonged to his wife, April.  State's Exhibit 16(A).  During a subsequent recorded jail call with April, Pate referenced the vibrator with a sense of familiarity, as Pate told April that the officers had found "Mr. Blue."  State's Exhibit 17; Trans. Vol. V, p. 1005.

{¶ 18} With regard to pornography, Pate initially told the investigating detective that he never watched pornographic videos on his cell phone.  Pate maintained that he only visited a website called "Bootyville," which he claimed showed no sexual acts, just women wearing G-strings.  State's Exhibit 16(A).  However, when the detective asked to search Pate's cell phone, Pate began to change his story and indicated that there was sexual content on his cell phone that his friends had sent him.

{¶ 19} Pate also told the detective that he never showed A.A.1 or A.A.2 pornographic videos.  However, as the interview progressed, Pate told the detective that the girls possibly saw pornographic videos on his cell phone by accident while "walking up" on him.  State's Exhibit 16(A).  Pate claimed that when he saw the girls looking at the video he would turn off his phone.

{¶ 20} During the course of the investigation, a mobile device examiner used

extraction software to extract the data on Pate's cell phone. The data extracted included a website search history showing that Pate had searched and visited several active websites on pornhub.com as recently as March 2019. The names of the websites that Pate visited included, but were not limited to: "Exxxtra Small Teens Porn Videos"; "Teen Porn Videos: Free College Teen Porn Sex Movies"; "Teen Virgin First Time Sex Porn Videos"; and "Free Midget Teen Girl Porn Videos." State's Exhibit 13.

### A.A.1's Allegations of Abuse

{¶ 21} A.A.1 testified at trial that Pate had licked her private on the skin while she was in the front room and back room of Pate's house. Trial Trans. Vol. IV, p. 635-648. A.A.1 also testified that Pate would lick her private in his truck and van when he would pick her up from school. *Id.* at 648-651. A.A.1 additionally testified that she observed Pate lick A.A.2's private while they were in the front and back room of Pate's house. *Id.* at 666-668. A.A.1 also testified that Pate would rub on her private with two fingers going in circles while they were in Pate's living room, back room, van, and truck. *Id.* at 653-655. A.A.1 further testified that Pate would make his private touch her bottom on the skin while she was bending over the arm of a chair in the living room with her pants off. *Id.* at 642-644.

{¶ 22} A.A.1 additionally testified that Pate would put a "blue squiggly thing" that made a buzzing sound on her private. *Id.* at 656-657. A.A.1 testified that Pate would also make her touch his private with "the blue squiggly thing" while in the front room and back room of his house and in his van. *Id.* at 662. A.A.1 testified that Pate kept "the blue squiggly thing" in his drawer in the back room. *Id.* at 655-656. When asked to

identify a picture of the blue vibrator that was found at Pate's residence, A.A.1 did not recognize it as the one that Pate had used on her. A.A.1 testified that the one used on her was round with no bumps on it. *Id.* at 674. Pate's wife, April, later testified that six or seven years ago she had a silver egg or oval shaped vibrator called "bullet." Trial Trans. Vol. VI, p. 1145 and 1165-1166.

{¶ 23} A.A.1 further testified that Pate would make her put her mouth on his private while they were in the living room and back room of his house. Trial Trans. Vol. IV, p. 659-661. A.A.1 also testified that Pate instructed her on how to do this by showing her a video on his cell phone. *Id.* A.A.1 testified that the video showed "girls sucking on the boys' things." *Id.* at 659 and 661. A.A.1 further testified that she saw Pate move his fingers in circles on A.A.3's private spot when he was changing her diaper. *Id.* at 663-664.

*Pate's Relationship to E.K. and E.K.'s Disclosure of Abuse*

{¶ 24} Pate's wife, April, is E.K.'s aunt, as April's brother is E.K.'s father. E.K., therefore, refers to Pate as her uncle. Between January and April 2004, E.K.'s mother resided at Orchard Hill Apartments in Miamisburg, Ohio. During this time, E.K., who was then 13 years old, would go between living with her mother and living with the Pates who also resided at the Orchard Hill Apartments. E.K. would stay with the Pates for two weeks at a time.

{¶ 25} On April 23, 2004, E.K. told her stepfather's sister, Janet Russell, that Pate sexually abused her. After Russell discussed the matter with E.K.'s mother, who was skeptical of E.K.'s allegations, Russell called the police. Officer Russell Green of the

Miamisburg Police Department responded to the call and obtained written statements from Russell and E.K. Although E.K.'s writing was somewhat illegible and difficult to discern, E.K. indicated at trial that her 2004 written statement described an incident in which Pate sexually abused her in his bedroom. A legible portion of E.K.'s written statement indicated that while she was living with Pate, he asked her if she wanted to do a "69 with him," and that she said "no." State's Exhibit 6. The statement also said that E.K. "got in the bed with him" and Pate "stuck it in [her]" and said "I love you." *Id.* Russell's written statement said that E.K. told her that Pate "stuck it in me a little" and that he "touched her in [private] areas and molested her, but said she was still a virgin." State's Exhibit 55. Although Officer Green reported the matter to his supervisor, for unknown reasons there was no further investigation into the matter.

{¶ 26} Shortly after reporting the incident, E.K. moved to Georgia to live with her grandmother. Approximately three or four years later, E.K. returned to Miamisburg, Ohio to live with her mother. After living with her mother, E.K. lived with a couple of girlfriends for two or three years until she met her now ex-wife. E.K. and her ex-wife lived in Kentucky for four years before they got divorced. Following the divorce, E.K. remained in Kentucky for three years until she moved back to Ohio due to financial hardship. Because she had nowhere to go, E.K. called her aunt, April, in 2018, to see if she could stay with her. April, who then lived at the Pates' current residence in Miamisburg, agreed to let E.K. live with her, Pate, and their daughter Belinda.

{¶ 27} Between 2018 and 2019, E.K. went back and forth between staying at the Pates' residence and a hotel room. While staying with the Pates, E.K. slept on a cot in the living room. E.K. felt awkward living with the Pates given what had happened

between her and Pate in 2004. E.K., however, kept to herself and did not interact much with Pate. E.K. testified that on December 15, 2018, Pate had sent her a text message while they were both at the Pates' residence that asked her if she wanted "to come back here show me tit[t]ies." Trial Trans. Vol. V, p. 846-847; State's Exhibit 7. E.K. did not respond to Pate's text message.

{¶ 28} Shortly thereafter, on January 24, 2019, E.K. was staying in a hotel room and was supposed to be picked up by Pate after she checked out. E.K. testified that before Pate picked her up, he sent her a text message that stated: "When I pick you up * * * can get some of that before you check out[?]" State's Exhibit 7. When E.K. texted back "some of what[?]" Pate responded: "W[h]at I always want[.] What do you say been a while[.] If so I'll take a shower and bring a jo[i]nt[.]" *Id.* E.K. testified that "what [Pate] always wants is pussy." Trial Trans. Vol. V, p. 849-850. E.K. testified that she declined Pate's offer by sending him a message saying that she was on her "monthly." *Id.* at 850; State's Exhibit 7. E.K. testified that by "monthly" she meant her "period" and that she was not really on her period. *Id.* at 850-851. E.K. testified that she lied about being on her period because it sickened her to think about having intercourse with Pate. *Id.* at 851.

{¶ 29} After learning about A.A.1's and A.A.2's disclosures of abuse, E.K. spoke to the investigating detective about certain interactions she observed between Pate and the girls that made her uncomfortable. E.K. also spoke to the detective about the abuse she suffered at the hands of Pate when she was a child. On March 29, 2019, E.K. wrote a statement discussing how Pate abused her. *See* State's Exhibit 8. Two weeks after meeting with the detective, E.K. permanently moved out of the Pates' residence.

*E.K.'s Allegations of Abuse*

{¶ 30} E.K. testified at trial regarding the abuse she suffered in 2004. E.K. testified that Pate took her upstairs to his bedroom to play with his "magic cards" and locked the door behind them while she and Pate were alone at his residence. Trial Trans. Vol. V, p. 821. E.K. testified that Pate started to get undressed and played a video on the television at the foot of his bed to help get him aroused. *Id.* at 822. E.K. testified that Pate helped her to get undressed and began stroking his penis and told her he had to "wake up his little friend." *Id.* at 823. E.K. testified that Pate then started rubbing her vagina and licked his fingers afterwards. *Id.* E.K. testified that Pate then pulled her to the edge of his bed and stuck his penis inside her vagina. *Id.* E.K. testified that the incident eventually ended by Pate pulling out his penis and masturbating until he ejaculated. *Id.* at 824.

{¶ 31} E.K. testified that whenever Pate had intercourse with her, he would first perform cunnilingus on her. *Id.* at 827. E.K. also testified that when he abused her in his bedroom, Pate always had the television on showing videos of people having intercourse and oral sex. *Id.* at 829. E.K. recalled that Pate instructed her on how to perform fellatio by showing her how to put her tongue on the back of his penis in order to apply pressure to it. *Id.* E.K. also testified that there was another incident in which Pate stuck his fingers inside her vagina while she was sitting in the front-passenger seat of his vehicle while they were coming back from the store. *Id.* at 825-826. E.K. testified that Pate told her that if she told her mother about the abuse she would get taken away and never see her mother again. *Id.* at 830.

*Verdict and Sentence*

{¶ 32} After considering all the testimony and evidence, the jury found Pate guilty of 25 of the 26 counts set forth in the indictment, the lone exception being the single count of gross sexual imposition involving A.A.3. The trial court also found Pate guilty of all the sexually violent predator specifications. At sentencing, the trial court merged several of the counts and ordered all of the counts to be served consecutively for a total, aggregate sentence of ten terms of life in prison without the possibility of parole with an additional definite term of 58 years to life in prison. The trial court also found that Pate was a Tier III sex offender, a child victim offender, and a sexual predator who was subject to registration, reporting, and verification requirements under both Meghan's Law and the Adam Walsh Act. Pate now appeals from his convictions, raising five assignments of error for review.

**First Assignment of Error**

{¶ 33} Under his first assignment of error, Pate contends that the trial court erred by failing to grant his motion to sever the charged offenses that pertained to E.K. from the charged offenses that pertained to A.A.1, A.A.2, and A.A.3., so that the offenses could be tried separately. We disagree.

*Joinder of Offenses*

{¶ 34} Crim.R. 8(A) provides, in relevant part, that: "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each

offense if the offenses charged * * * are of the same or similar character[.]" Crim.R 8(A) also allows for the joinder of offenses that "are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Permitting joinder " 'conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries.' " *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 103, quoting *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 35} " 'Notwithstanding the policy in favor of joinder,' Crim.R. 14 permits a defendant to request severance of the counts in an indictment 'on the grounds that he or she is prejudiced by the joinder of multiple offenses.' " *Id.* at ¶ 104, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49. "The defendant 'has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.' " *Id.*, quoting *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). The State, however, can overcome a defendant's claim of prejudicial joinder in two ways. *Id.* "The first way is by satisfying the 'other acts' test." (Citation omitted.) *LaMar* at ¶ 50. That is, "[i]f in separate trials the state could introduce evidence of the joined offenses as 'other acts' under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder." (Citations omitted.) *Id.* "The state may also negate a claim of prejudice by satisfying the less stringent 'joinder test,' which requires a showing 'that evidence of each crime joined at trial is simple and direct.' " *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990) and *Torres* at 344.

{¶ 36} In order to prevail on a claim that the trial court erred in denying a motion to sever, the defendant " 'must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial.' " *Ford* at ¶ 106, quoting *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992). A trial court's ruling on a Crim.R. 14 motion is therefore reviewed for an abuse of discretion. *Id.*, citing *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. An abuse of discretion most often involves an unreasonable decision that is not supported by a sound reasoning process. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 37} As noted above, Pate argues that the trial court abused its discretion when it denied his motion to sever the charged offenses that pertained to E.K. from the charged offenses that pertained to A.A.1, A.A.2, and A.A.3. In support of the motion, Pate argued that joining these offenses would prejudice him because the 12 to 15-year time span between the allegations would create an unfavorable impression of him in the mind of the jurors. Pate also argued that the allegations pertaining to E.K. were so dissimilar from the allegations pertaining to A.A.1, A.A.2, and A.A.3, that joinder served no valid evidentiary purpose. Pate further argued that the State would not be permitted to

introduce evidence of the joined offenses in separate trials as other-acts evidence under Evid.R. 404(B). The trial court disagreed with Pate's arguments and denied the motion to sever. For the following reasons, we do not find that the trial court's decision was an abuse of discretion.

*Evid.R. 404(B) Other-Acts Evidence*

{¶ 38} As previously noted, the State can overcome a defendant's claim of prejudicial joinder by showing that evidence of the joined offenses would be admissible at separate trials as other-acts evidence under Evid.R. 404(B). *Ford* at ¶ 104; *Lamar* at ¶ 50. Evid.R. 404(B) provides, in relevant part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶ 39} Therefore, under Evid.R. 404(B), "evidence of other crimes, wrongs, or acts may be admissible for any purpose material to the issue of guilt or innocence as long as it is not being introduced for the purpose of showing the accused's propensity to commit bad acts." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 49 (2d Dist.). In other words, "evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22.

{¶ 40} R.C. 2945.59 similarly provides that:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 41} Like Evid.R. 404(B), R.C. 2945.59 "preclude[s] the admission of evidence of other crimes, wrongs, or acts offered to prove the character of an accused in order to show that the accused acted in conformity therewith, but it does not preclude admission of that evidence for other purposes, e.g., to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 25.

{¶ 42} In *Williams*, the Supreme Court of Ohio "set forth a three-part analysis for determining the admissibility of other-acts evidence: to be admissible, (1) the evidence must be relevant, Evid.R. 401, (2) the evidence cannot be presented to prove a person's character to show conduct in conformity therewith but must instead be presented for a legitimate other purpose, Evid.R. 404(B), and (3) the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice, Evid.R. 403." *State v. Graham*, Ohio Slip Opinion No. 2020-Ohio-6700, __ N.E.3d __ ¶ 72. " 'The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law.' " *Id.*, quoting *Hartman* at ¶ 22. "The court is precluded from admitting improper character

evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose." (Citations omitted.) *Id.*

{¶ 43} In denying Pate's motion to sever, the trial court applied the three-part test in *Williams* and found that *Williams* was factually similar to the instant case. Like Pate, the defendant in *Williams* was convicted of several counts of rape, gross sexual imposition, and unlawful sexual conduct with a minor. *Williams* at ¶ 1. The convicted offenses in *Williams* stemmed from the defendant sexually abusing J.H., a 14-year old boy who the defendant mentored at church. *Id.* at ¶ 3. Over objection, the trial court in *Williams* permitted the State to admit other-acts evidence from a witness who testified that the defendant had similarly abused him 10 years earlier when he was 16 years old. *Id.* at ¶ 5-8. The State offered the witness's testimony to show that the defendant had a common plan or scheme, a distinct pattern of sexual conduct, and the intent to achieve sexual gratification with teenage males. *Id.* at ¶ 5.

{¶ 44} On appeal, the Eighth District Court of Appeals held that the witness's testimony in *Williams* was inadmissible other acts evidence under Evid.R. 404(B). *Id.* at ¶ 10. Relying on *State v. Curry*, 43 Ohio St.2d 66, 330 N.E.2d 720 (1975), the Eighth District determined that other-acts evidence offered to show a scheme, plan, or system is inadmissible unless it shows the background of the alleged crime or proves the identity of the accused. *Id.* The Eighth District therefore held that *Curry* precluded the admission of evidence of the defendant's prior sexual relationship with a different minor, because the sexual acts of that relationship had been "chronologically and factually separate occurrences" and the identity of the accused was not an issue at trial. *Id.* at ¶ 1. The Supreme Court of Ohio, however, disagreed and reversed the Eighth District's

decision.  *Id.* at ¶ 2.

**{¶ 45}** In reversing *Williams*, the Supreme Court explained that evidence of other crimes, wrongs, or acts of an accused may be admissible to prove intent or plan, even if the identity of an accused or the immediate background of a crime is not at issue.  *Id.* at ¶ 2.  The Supreme Court held that evidence of Williams's sexual relations with another teenage boy on previous occasions was relevant to prove that the defendant had a plan to target vulnerable teenage boys, to mentor them, and to groom them for sexual activity with the intent of sexual gratification.  *Id.* at ¶ 22.  Instead of simply showing propensity, the Supreme Court found that "[t]he state offered the testimony of [the witness] to demonstrate the motive, preparation, and plan of the accused to target teenage males who had no father figure and to gain their trust and confidence for the purpose of grooming them for sexual activity with the intent to be sexually gratified."  *Id.* at ¶ 21.

**{¶ 46}** The Supreme Court also noted that the witness's testimony "rebutted the suggestion offered by the defense during opening statements that J.H. had falsely accused Williams of abuse with the hope of getting out of trouble at school and the suggestion that Williams was sexually attracted to women."  *Id.* at ¶ 22.  The Supreme Court additionally found that the witness's testimony indicating "that Williams received 'some type of sexual gratification' also [was] relevant to show that Williams's intent was sexual gratification."  (Citation omitted.)  *Id.*  Therefore, having found that the witness's testimony was relevant, probative of something other than propensity, and not unfairly prejudicial, the Supreme Court in *Williams* reinstated the judgment of the trial court.  *Id.* at ¶ 21-25.

**{¶ 47}** Relying on *Williams,* the trial court in this case concluded that if the

allegations concerning E.K. were tried separately from the allegations concerning A.A.1, A.A.2, and A.A.3, the evidence supporting their respective allegations would be admissible as other-acts evidence under Evid.R. 404(B). Using the three-part test in *Williams*, the trial court found that: (1) the evidence supporting the charges relating to E.K. was relevant to the charges relating to A.A.1, A.A.2, and A.A.3, and vice versa; (2) the evidence supporting the charges was probative of non-propensity based issues, i.e., Pate's motive, preparation, plan, lack of mistake or accident, scheme, or pattern of conduct; and (3) the probative value of the evidence was not outweighed by the danger of unfair prejudice.

{¶ 48} Pate challenges the trial court's decision on this matter based on the Supreme Court of Ohio's recent decision in *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651. In *Hartman*, the defendant was accused of raping an adult female acquaintance in her hotel room after they had spent the evening out with a group of friends. *Id.* at ¶ 1. In order to counter Hartman's claim that the sexual encounter with the rape victim was consensual, the State presented evidence establishing that Hartman had sexually abused his stepdaughter when she was a child. *Id.* at ¶ 12. Following trial, Hartman was found guilty of rape and appealed his conviction. *Id.* at ¶ 16. On appeal, the Eighth District Court of Appeals reversed Hartman's convictions on grounds that the evidence purporting to show that he sexually abused his stepdaughter was inadmissible other-acts evidence under Evid.R. 404(B). *Id.* at ¶ 17. The Supreme Court of Ohio agreed with the Eighth District and Hartman and held that the evidence at issue "constituted improper propensity evidence, and the trial court erred in admitting it." *Id.* at ¶ 64.

{¶ 49} In reaching its decision in *Hartman*, the Supreme Court discussed the exceptions listed in Evid.R. 404(B) in great detail. With regard to motive, the Supreme Court explained that: "Motive evidence establishes that the accused had a specific reason to commit a crime." *Id.* at ¶ 48. The Supreme Court found that other-acts evidence is not admissible for purposes of establishing motive in rape cases when the evidence does not provide any motive beyond that which can be inferred from the commission of the offenses itself, i.e., sexual gratification. *Id.* at ¶ 49-50. For this reason, the motive exception would not apply in the instant case.

{¶ 50} When discussing the "common scheme or plan" exception in Evid.R. 404(B), the Supreme Court in *Hartman* distinguished its decision in *Williams* and stated the following:

> Here, the evidence plainly does not fit into the common understanding of plan evidence. Hartman's alleged assault of his stepdaughter was not part of a larger scheme involving the rape of E.W. Nonetheless, the state contends that the evidence was admissible as a result of our decision in *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278.
>
> In *Williams*, we considered whether other-acts evidence tending to show a plan may be admitted when the identity of the assailant is not at issue. Although we had previously indicated that such evidence will most often be relevant to illustrate the immediate background of the offense or identify the perpetrator, *see Curry*, 43 Ohio St.2d at 73, 330 N.E.2d 720, we confirmed in *Williams* that plan evidence is not necessarily limited to those

scenarios and may be admitted for other purposes, *Williams* at ¶ 19.

**While the other-acts evidence in *Williams* tended to show that the defendant, who had been charged with the rape of a 14-year-old boy, had a pattern of grooming teenage boys to take advantage of them sexually, that fact alone is not what overcame the propensity bar. Rather, the result in *Williams* turned on the state's use of the other-acts evidence for the purpose of refuting the defendant's claims that he was not sexually attracted to teenage boys and establishing that the defendant had acted with the specific intent of achieving sexual gratification.** *Id.* at ¶ 22, 25.

There may be instances in which seemingly unrelated but highly similar crimes could be evidence of a common scheme to commit the charged crime—perhaps, for instance, a string of robberies occurring close in time and location. We stress, however, that plan evidence should show that the crime being charged and the other acts are part of the same grand design by the defendant. Otherwise, proof that the accused has committed similar crimes is no different than proof that the accused has a propensity for committing that type of crime. The takeaway for the jury becomes, "The accused did it once recently; therefore, the accused did it again." Imwinkelried, *Using a Contextual Construction to Resolve the Dispute over the Meaning of the Term "Plan" in Federal Rule of Evidence 404(b)*, 43 U.Kan.L.Rev. 1005, 1012 (1995).

Here, Hartman's molestation of his stepdaughter four years prior was

not linked to any overarching plan to commit rape against E.W. The

incidents are wholly distinct, and unlike the common-scheme evidence

demonstrated in *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983

N.E.2d 1278, the other-acts evidence in this case contains few similarities

to the crimes charged. Thus, the evidence was not relevant to show a

common scheme or plan.

(Emphasis added.) *Hartman,* 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at

¶ 43-47.

{¶ 51} The Supreme Court in *Hartman* also discussed the absence of mistake and

intent exceptions in Evid.R. 404(B) and stated the following:

Other-acts evidence is admissible to negate a defendant's claim of

mistake or accident with respect to the commission of the alleged crime;

such evidence tends "[t]o show, by similar acts or incidents, that the act in

question was not performed inadvertently, accidentally, involuntarily, or

without guilty knowledge." McCormick, *Evidence*, Section 190, at 804 (4th

Ed.1994). In the criminal context, there are generally two ways in which

the accused may raise a claim of accident. Imwinkelried, 51 Ohio St.L.J.

at 593. The first involves whether a criminal act occurred at all. * * *

The second scenario implicates the intent of the accused. The

question here is not whether the act occurred but whether the defendant

acted with a criminal intent. * * *

* * *

There is a thin line between the permissible use of other-acts

evidence to show intent and the impermissible use to show propensity. Allowing other-acts evidence to prove the defendant's state of mind "flirt[s] dangerously with eviscerating the character evidence prohibition" altogether. Leonard at Section 7.4. * * *

For this reason, courts should use caution when evaluating whether to admit other-acts evidence for the purpose of showing intent or absence of mistake. To determine whether other-acts evidence is genuinely probative of the intent of the accused to commit the charged crime, rather than merely the accused's propensity to commit similar crimes, the question is whether, "under the circumstances, the detailed facts of the charged and uncharged offenses strongly suggest that an innocent explanation is implausible." (Emphasis sic.) *Id.* at Section 7.5.2. Or to put it another way, the other-acts evidence "must be so related to the crime charged in time or circumstances that evidence of the other acts is significantly useful in showing the defendant's intent in connection with the crime charged." 1 Wharton's Criminal Evidence at Section 4:31.

(Emphasis added.) *Hartman* at ¶ 52-58.

{¶ 52} With the foregoing principles in mind, we find that the evidence supporting the joined offenses in this case was more similar to the evidence in *Williams* than *Hartman*. We reach this conclusion because the similarities between the abuse alleged by A.A.1, A.A.2, and E.K. were not only probative of Pate's common scheme or pattern of sexually abusing young girls who were entrusted into his care, but it was also probative of absence of mistake. Specifically, E.K.'s testimony that Pate played pornographic

videos when he sexually abused her in 2004 tended to refute Pate's claim that A.A.1 and A.A.2 accidently saw pornographic videos on his cell phone. E.K.'s testimony that Pate played pornographic videos showing people having intercourse and oral sex when he abused her and also instructed her on how to perform fellatio was similar to A.A.1's testimony that Pate showed her how to perform fellatio by showing her videos of "girls sucking on boys' things." Trial Trans. Vol. IV, p. 659-661. E.K.'s testimony was likewise similar to A.A.2's allegation in her forensic interview that Pate would show her videos of adults engaging in oral sex and would make her do the things shown in the videos. The similarities between these allegations indicated that Pate's actions were not performed innocently or by accident. Therefore, we find that the evidence of the joined offenses was relevant and admissible for a reason other than propensity.

{¶ 53} We further find that the probative value of the other-acts evidence was not outweighed by the danger of unfair prejudice. The other-acts evidence was greatly probative in that it corroborated the victims' allegations of abuse. This is especially important in this case given that A.A.1 and A.A.2 were very young and thus more susceptible to attacks on their credibility and reliability.

{¶ 54} We also note that the Supreme Court of Ohio has recognized that when a witness is a material witness in two separate cases there is no prejudice in trying the cases together. State v. Gordon, 152 Ohio St.3d 528, 2018-Ohio-259, 98 N.E.3d 251, ¶ 28. A material witness is '[a] witness who can testify about matters having some logical connection with the consequential facts, esp. if few others, if any, know about those matters.' " Id., quoting Black's Law Dictionary 1839 (10th Ed.2014).

{¶ 55} In this case, E.K. was a material witness in that her testimony not only

concerned her allegations of abuse, but A.A.1's and A.A.2's allegations as well. Specifically, E.K. testified that when A.A.1 and A.A.2 were around Pate's computer, she would occasionally "hear the girls tell [Pate] to stop, but when [she'd] look over at them * * * [Pate] would make it look like he was patting their butt or tapping their hips or something." Trial Trans. Vol. V, p. 842. E.K. also testified that Pate "would be kissing them on the neck," and that the girls "never kissed him back." *Id.* at 875. E.K. further testified that when Pate tried to kiss the girls, they "pushed their head down to their shoulders and would tell him 'No, stop.' " *Id.* 875-876. Therefore, because E.K. was a material witness in both matters, there was no prejudice in joining the offenses in question.

{¶ 56} For the foregoing reasons, we find that all three parts of the other-acts admissibility test set forth in *Williams* were satisfied. That is, the other-acts evidence was relevant, probative of a non-propensity issue, and its probative value was not outweighed by the danger of unfair prejudice. *See Graham*, Ohio Slip Opinion No. 2020-Ohio-6700, __ N.E.3d __, at ¶ 72. Therefore, the evidence of the joined offenses was admissible as other-acts evidence under Evid.R. 404(B). Because the State can overcome a defendant's claim of prejudicial joinder by showing that it could have introduced evidence of the joined offenses as other-acts evidence under Evid.R. 404(B), and because the trial court did not err in finding that the evidence at issue could be introduced under that rule, the trial court did not abuse its discretion in denying Pate's motion to sever the joined offenses.

*Simple and Direct Evidence*

{¶ 57} Even if we had found that the evidence at issue was not admissible as other-acts evidence, the State can also defeat a claim of prejudicial joinder by showing that the evidence pertaining to each offense joined at trial is simple and direct. *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 104; *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. "[W]hen simple and direct evidence exists, an accused is not prejudiced by joinder regardless of whether the evidence is admissible as other-acts evidence." (Citations omitted.) *State v. Coley*, 93 Ohio St.3d 253, 260, 754 N.E.2d 1129 (2001), citing *Lott* at 163. Evidence is simple and direct if the jury can readily separate the proof required for each offense, the evidence is straightforward and unlikely to confuse jurors, and if there is little danger that the jury would improperly consider testimony on one offense as corroborative of the other. *State v. Morgan*, 2d Dist. Clark No. 2018-CA-103, 2019-Ohio-3691, ¶ 79, citing *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 34, citing *LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 50-51. (Other citations omitted.)

{¶ 58} In denying Pate's motion to sever, the trial court found that the evidence supporting the joined offenses was separate and distinct and that there was a minimal likelihood of jury confusion. After a thorough review of the record, we find that the trial court's decision was reasonable. There is nothing in the record suggesting that the jurors were ever confused by the evidence or were unable to segregate the offenses and evidence related to each charge. The jury, in fact, found Pate not guilty of one of the charges levied against him, thereby demonstrating that the jury was able to sift through the evidence and segregate the offenses successfully. Therefore, while there were several charges brought in this case, the record nevertheless indicates that the evidence

supporting each charge was simple and direct. Because the evidence was simple and direct, for that reason as well, the trial court did not abuse its discretion in denying Pate's motion to sever.

{¶ 59} Pate's first assignment of error is overruled.

## Second Assignment of Error

{¶ 60} Under his second assignment of error, Pate challenges the trial court's decision to permit portions of A.A.1's and A.A.2's forensic interviews to be admitted into evidence at trial. In support of this claim, Pate contends that the forensic interviews were inadmissible hearsay evidence under Evid.R. 802. Specifically, Pate claims that the trial court erred in admitting the forensic interviews under the hearsay exceptions in Evid.R. 803(4) and Evid.R. 807(A). Pate also contends that since A.A.1 testified at trial, her forensic interview should not have been admitted into evidence because it was cumulative and prejudicial. For the reasons set forth below, we find that each of Pate's claims lack merit.

### Standard of Review

{¶ 61} "The admission or exclusion of evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. Disagreements about the admission of evidence are therefore reviewed for an abuse of discretion. *State v. Freeman*, 2d Dist. Greene No. 2020-CA-33, 2021-Ohio-734, ¶ 54, citing *Sage*. As a result, "[h]earsay challenges to a trial court's admission of statements from children in sex-abuse cases are reviewed under an abuse-

of-discretion standard." *State v. Moore*, 2019-Ohio-1671, 135 N.E.3d 1114, ¶ 21 (2d Dist.), citing *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 48. As previously noted, "[a] trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, at ¶ 34.

*A.A.1's and A.A.2's Forensic Interviews were Admissible Hearsay Evidence*

{¶ 62} Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). As a general rule, hearsay statements are inadmissible as evidence. Evid.R. 802. There are, however, several exceptions to this rule, including the exceptions set forth in Evid.R. 803(4) and Evid.R. 807(A). We have addressed each of these exceptions separately below.

1. Evid.R. 803(4)

{¶ 63} Evid.R. 803(4) provides that a hearsay statement made for purposes of medical diagnosis or treatment is not excluded by the hearsay rule, even though the declarant is available as a witness. Specifically, the rule permits "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). "Such statements are deemed to be trustworthy and admissible because 'the effectiveness of the treatment depends upon the accuracy of information given to the physician [so] the declarant is motivated to tell the truth.' " *State v. Hazel*, 2d Dist. Clark

No. 2011-CA-16, 2012-Ohio-835, ¶ 45, quoting *State v. Brewer*, 6th Dist. Erie No. E-01-053, 2003-Ohio-3423, ¶ 28, citing *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988).

{¶ 64} In the present case, the trial court found that A.A.1's and A.A.2's forensic interviews were admissible hearsay under Evid.R. 803(4) because the statements elicited during the interviews were for purposes of medical diagnosis or treatment. Pate, however, contends that the primary purpose of the interviews was forensic information gathering, not medical diagnosis or treatment. Therefore, according to Pate, the challenged evidence was hearsay and not admissible under Evid.R. 803(4). We disagree.

{¶ 65} "In determining whether statements made to a forensic interviewer at a child advocacy center are made for the purpose of medical diagnosis and treatment, as opposed to forensic investigative purposes, the court must 'identify the primary purpose of the statements.' " *State v. Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856, ¶ 82, quoting *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 28. "Whether the purpose of a child's statements is for medical diagnosis or treatment will depend on the facts of the particular case." *State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 73 (2d Dist.), citing *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944 at ¶ 49.

{¶ 66} In *Arnold*, the Supreme Court of Ohio recognized that child-advocacy centers are unique insofar as a single interview with a child serves "dual purposes," which are: "(1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and

treatment of the victim." *Arnold* at ¶ 33. The Supreme Court in *Arnold* also found nothing objectionable about considering the child's statements individually to determine which ones were for medical diagnosis or treatment and to exclude those that were not. *Id*. at ¶ 42. For example, the Supreme Court found that some of the child's statements primarily had a forensic or investigative purpose, including the child's assertion that the defendant had "shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's 'pee-pee' looked like; and her statement that Arnold removed her underwear." *Id*. at ¶ 34. The Supreme Court found that "[t]hese statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation." *Id*.

{¶ 67} The Supreme Court, however, also found that "other statements provided information that was necessary to diagnose and medically treat" the child victim. *Id.* at ¶ 37. The Supreme Court noted that "[t]he history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary." *Id*. Specifically, the Supreme Court held that the victim's "statements that described the acts that Arnold performed, including that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-pee,' that Arnold's 'pee-pee' touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee' " were necessary for medical diagnosis or treatment. *Id*. at ¶ 38. The fact that the victim already had undergone a "rape-kit examination" did not dissuade the Supreme Court from finding that the foregoing statements were necessary for subsequent medical diagnosis or treatment. *Id*. at ¶ 39.

The Supreme Court also found nothing objectionable about the fact that police watched the interview or the fact that information obtained for medical purposes ultimately was used to prosecute the defendant. These considerations did "not change the fact" that some of the child's statements "were made for medical diagnosis and treatment." *Id.* at ¶ 43.

{¶ 68} In *State v. Warman*, 12th Dist. Butler No. CA2016-02-029, 2017-Ohio-244, the Twelfth District Court of Appeals applied *Arnold* in a case involving a recording of an interview at a child-advocacy center. After reviewing the child's statements during the interview, the Twelfth District concluded that some of the statements were admissible under Evid.R. 803(4) and some were not. *Id.* at ¶ 51-52. Although the trial court in *Warman* had allowed the jury to see a video of the entire recorded interview, the Twelfth District held that the introduction of the inadmissible statements was harmless error and stated the following:

Under *Arnold*, KG6's statements concerning the specifics of the sexual act she performed, i.e., how many times she did it, her physical interaction with his penis, and "ducking," were primarily for the purpose of medical treatment. However, the remaining information in the interview, including where the car was located, where she and her siblings were situated in the car, and that she had a shirt around her eyes were statements drawn from her primarily for a forensic or investigative purpose. Because these statements were not primarily for medical diagnosis or treatment they should not have been admitted under the Evid.R. 803(4) hearsay exception.

Accordingly, some of the statements KG6 made in the interview did not fall under the hearsay exception for medical diagnosis or treatment, and therefore the admission of those statements was error to the extent that they were offered to prove the truth of the matter they asserted. However, such error was harmless as the state presented ample evidence other than the video-recorded interview to sustain Warman's conviction for the rape of KG6.

*Id.* at ¶ 50-52.

**{¶ 69}** In *Remy*, 2d Dist. Clark No. 2017-CA-6, 2018-Ohio-2856, this court also considered whether statements made by child sex-abuse victims were admissible under Evid.R. 803(4) as statements made for purposes of medical diagnosis or treatment. Similar to the case at bar, *Remy* involved three young children who had been sexually abused by their stepfather. *Id.* at ¶ 1-8. After disclosing the abuse, the children underwent forensic interviews at a child-advocacy center. *Id.* at ¶ 9. On appeal, we found that the trial court had erred in admitting the children's statements during the interview under Evid.R. 803(4), but determined the error was harmless. *Id.* at ¶ 90-91. In so holding, we stated the following:

Based on the evidence before us, the primary purpose of [social worker] Lowe's forensic interviews with D.C., J.C., and K.C. was for forensic information-gathering, not for the purpose of medical diagnosis and treatment. The interviews were coordinated with law enforcement personnel, Detective Fent observed the interviews from an observation room, and Lowe consulted with Detective Fent prior to completing the

interviews that the detective attended. The interviews were not conducted in a medical facility or through referrals from a medical facility, and there is no indication that the children gave the statements for purposes of obtaining a medical diagnosis or treatment. Although referrals to physicians and counselors were made following certain interviews, the primary goals stated by Lowe were information-gathering for child safety, not to provide immediate medical (physical or mental health) care and diagnosis.

Although the recorded videos of Lowe's interviews were objectionable, we nevertheless conclude, upon review of the entire record, that their admission was harmless. As with the statements in [another trial witness's] recordings, the allegations by the children in the challenged interviews with Lowe were repeated to other medical professionals and/or therapists. Accordingly, the content of the children's statements would have been before the jury even absent the video-taped interviews. In addition, even without the video-recordings, Lowe would have been permitted to testify about the demeanor of the children during the interviews and to the referrals that were made as a result of the girls' statements during the interviews. Arguably, Lowe might have been permitted to testify about some of the girls' allegations to explain why the referrals were made, but not for the truth of the allegations themselves.

*Id.* at ¶ 90-91.

{¶ 70} After *Remy*, this court addressed the same Evid.R. 803(4) issue in *State v. Moore*, 2019-Ohio-1671, 135 N.E.3d 1114 (2d Dist.) and noted the following:

[I]n the *Remy* opinion * * *, this court did not attempt to parse the children's statements to determine whether the primary purpose for some of them might have been medical diagnosis or treatment. Instead, we simply conducted a harmless-error analysis. As illustrated by *Arnold* and *Warman*, however, it is also appropriate to consider a child's statements one-by-one to see whether any of them fit within the Evid.R. 803(4) hearsay exception. In fact, in a second *Remy* case * * * this court addressed the same interviews in the context of the children's mother's appeal from her own convictions related to her husband's abuse. In *State v. Remy*, 2018-Ohio-2857, 117 N.E.3d 916 (2d Dist.), we explicitly recognized that "some statements" made during the children's interviews at the child-advocacy center "may have been made for purpose of treatment" and, thus, may not have been objectionable on hearsay grounds. *Id.* at ¶¶ 64-65 (acknowledging that not all of the children's statements at the child-advocacy center were necessarily subject to exclusion as hearsay and recognizing that some of the statements may have been related to medical treatment). That is precisely what we have found in Moore's case.

*Moore* at ¶ 32.

**{¶ 71}** Like *Arnold* and *Warman*, in *Moore* we held that the critical aspects of the child victim's statements to the interviewer were properly admitted under Evid.R. 803(4) and that the trial court's erroneous admission of other hearsay statements by the victim during her interview at the child-advocacy center constituted harmless error. *Id.* at ¶ 33. Specifically, we stated that:

Based on our review of the record, the trial court did not act unreasonably to the extent that it allowed the jury to hear [the victim's] statements to [the interviewer] about specific sex acts Moore performed on her. Those statements referenced multiple instances of vaginal intercourse, oral sex, contact between Moore's penis and [the victim's] "butt," and touching of her breasts and vagina. The trial court acted within its discretion in concluding that the primary purpose of these statements was medical diagnosis or treatment.

We believe the trial court erred, however, insofar as it allowed the jury to hear all of [the victim's] statements to [the interviewer]. For example, [the victim's] statements about the physical location of the abuse and the layout of the house, the presence of anyone else, what Moore said or sounds he made while performing sex acts, and whether [the victim] was asleep all appear to have been elicited and made primarily for investigatory purposes. These sorts of contextual statements were not reasonably necessary for medical diagnosis or treatment and, therefore, were not admissible under the Evid.R. 803(4) hearsay exception. As the Twelfth District did in *Warman*, however, we find that the trial court's admission of these non-medical statements constituted harmless error.

(Footnote omitted.) *Id.* at ¶ 29-30.

**{¶ 72}** Based on the holdings in *Arnold*, *Moore*, and *Warman*, we find that the statements A.A.1 and A.A.2 made during their interviews describing the nature of the sexual abuse they endured were for purposes of medical diagnosis and treatment and

were therefore admissible under Evid.R. 803(4). For example, A.A.1's statements during the interview indicating that Pate rubbed on her private with his fingers going in circles, put a "blue squiggly thing" on her private, licked her private, and made her suck his private were all admissible for purposes of medical diagnosis and treatment under Evid.R. 803(4). *See* State's Exhibit 5(A). Likewise, A.A.2's statements during the interview indicating that Pate put his "thing" in her mouth, touched her "spot" with a wet finger by putting his finger in his mouth and then dipping it in her "spot", and that Pate hurt her when he was "down there," were also admissible under Evid.R. 803(4). *See id.*

**{¶ 73}** Although A.A.1's and A.A.2's forensic interviews contained other statements that did not pertain to medical diagnosis or treatment, upon review, we find that the admission of those statements was harmless error. This is because A.A.1 reiterated the non-medical statements during her live testimony at trial, and, for reasons discussed more fully below, all of A.A.2's non-medical statements were separately admissible under Evid.R. 807(A). Therefore, all of the statements would have been presented to the jury regardless of their admissibility under Evid.R. 803(4). Accordingly, we find that the trial court did not err in applying Evid.R. 803(4) to the statements that pertained to the nature of Pate's sexual abuse, and that the other statements improperly admitted under that rule amounted to harmless error.

## 2. Evid.R. 807(A)

**{¶ 74}** Evid.R. 807 "provides an exception to the general exclusion of hearsay statements when a child under the age of 12 at the time of trial or hearing makes an out-of-court statement describing any sexual act that is performed on, with, or by the child." *State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, 906 N.E.2d 427, ¶ 14, citing

Evid.R. 807(A). Specifically, that rule provides that:

An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing any sexual activity performed, or attempted to be performed, by, with, or on the child or describing any act or attempted act of physical harm directed against the child's person is not excluded as hearsay under Evid.R. 802 if all the following apply:

(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual activity or attempted sexual activity, or of the act or attempted act of physical harm directed against the child's

person;

(2) The child's testimony is not reasonably obtainable by the proponent of the statement;

(3) There is independent proof of the sexual activity or attempted sexual activity, or of the act or attempted act of physical harm directed against the child's person;

(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness.

Evid.R. 807(A).

{¶ 75} "For the statement to be admitted [under Evid.R. 807(A)], the proponent of the statement must not be able to reasonably obtain the child's testimony." *Silverman* at ¶ 14, citing Evid.R. 807(A)(2). "[W]hen a court finds that a child is not competent to be a witness, her testimony is 'not reasonably obtainable' pursuant to Evid.R. 807(B)(2)." (Citations omitted.) *State v. Cardosi*, 122 Ohio App.3d 70, 75, 701 N.E.2d 44 (2d Dist.1997); *State v. C.W.*, 2016-Ohio-1558, 63 N.E.3d 709, ¶ 9 (2d Dist.). In this case, the trial court conducted a voir dire examination and determined that A.A.2 was not competent to testify at trial. Therefore, because A.A.2's was not competent to testify at trial, her testimony was not reasonably obtainable under Evid.R. 807(A).

{¶ 76} Following an evidentiary hearing, the trial court found that all four

requirements of Evid.R. 807(A) were satisfied in order to permit A.A.2's forensic interview to be admitted at trial. Pate, however, contends that the requirement under Evid.R. 807(A)(1) was not satisfied because the statements A.A.2 made during the interview were unreliable. Pate argues that A.A.2's statements were unreliable because the interviewer, Jennifer Knisley, testified that A.A.2 was "scatterbrained" and "chaotic" during the interview, which prevented Knisley from following the "usual protocol." Specifically, Knisley testified that:

> [A.A.2 is] five and just developmentally [she] was a little bit more scatterbrained and kind of chaotic, just—she's a very active five-year-old and so she wanted to talk about what she wanted to talk about and not necessarily follow, you know, this protocol or this structure that I wanted to go through, so. She demonstrates some of that, was just kind of being all over and she answers what she wants when she wants.

Trial Trans. Vol. IV, p. 730-731.

{¶ 77} Upon review, we find that Knisley's testimony does not indicate that A.A.2's statements were unreliable. When determining the reliability of A.A.2's statements, the trial court thoroughly considered all of the circumstances surrounding the forensic interview, including the factors listed in Evid.R. 807(A)(1). Specifically, the trial court found that A.A.2's statements were elicited by means of a non-leading forensic interview that showed spontaneity. Although we find that there were some instances where Knisley had to use leading questions in order to guide A.A.2 back to the topic being discussed and repeated several questions due to A.A.2's lack of focus, the video of the interview as a whole establishes that the interview was neutral and that Knisley did not

improperly influence A.A.2's responses. The video also shows that A.A.2 would at times spontaneously provide unsolicited details about the sexual abuse by Pate. The video further supports the trial court's finding that there were no material, internal consistencies in A.A.2's allegations.

{¶ 78} The trial court also reasonably found that, due A.A.2's young age, A.A.2 did not have the cognitive wherewithal to connive a plan to fabricate allegations of sexual abuse against Pate. In addition, the trial court reasonably found that A.A.2's use of the term "sex" during the interview and her ability to physically imitate sex acts was not something a five-year old would be expected to know or reference. The trial court further found that the guarantees of trustworthiness that one would expect in statements admitted under Evid.R. 803(4) were present in the forensic interview. Based on all of these findings, the trial court reasonably determined that A.A.2's forensic interview had particularized guarantees of trustworthiness that made it sufficiently reliable.

{¶ 79} Because the trial court's findings as to the reliability of A.A.2's statements are reasonable, and because the other requirements under Evid.R. 807(A) are not in dispute, we do not find that the trial court abused its discretion in admitting A.A.2's forensic interview under the hearsay exception in Evid.R. 807(A).

*The Cumulative Forensic Interview Evidence Was Not Prejudicial*

{¶ 80} Pate also contends that since A.A.1 testified about the allegations of sexual abuse at trial, the trial court erred in admitting her forensic interview because it was cumulative to her testimony and thus prejudicial. We again disagree.

{¶ 81} " ' "Cumulative evidence" ' is additional evidence of the same kind to the

same point." *State v. Jali*, 2d Dist. Montgomery No. 28294, 2020-Ohio-208, ¶ 41, quoting *Kroger v. Ryan*, 83 Ohio St. 299, 94 N.E. 428 (1911), syllabus. "Pursuant to Evid.R. 403(B), it is within the sound discretion of the trial court to exclude cumulative evidence only when the probative value of the evidence is substantially outweighed by the danger of a material prejudice to the defendant." *State v. Arrone*, 2d Dist. Greene No. 2005-CA-89, 2006-Ohio-4144, ¶ 152. "The mere fact that evidence is repetitive will not be considered reversible error unless the defendant was unfairly prejudiced thereby." *State v. Baker*, 2d Dist. Montgomery No. 23933, 2011-Ohio-1820, ¶ 16, quoting *State v. Smith*, 80 Ohio St.3d 89, 108-109, 684 N.E.2d 668 (1997). "The pertinent question is whether the evidence was unfairly prejudicial to the defendant, not whether it was unfavorable to him." *Id.*

{¶ 82} Upon review, we find that A.A.1's interview was cumulative in that there was nothing in the admitted portion of A.A.1's forensic interview that was not covered by A.A.1's trial testimony. The record, however, indicates that the interview was admitted to assist Knisley in explaining how she analyzed the context of A.A.1's allegations, i.e., whether the allegations had characteristics of innocent touching or sexual abuse. *See* Trial Trans. Vol. IV, p. 723 and 728-729. Therefore, while the admission of A.A.1's interview may have been cumulative, it was not *needlessly* cumulative. Regardless, Pate failed to demonstrate how he was materially prejudiced by the cumulative nature of the evidence. Pate simply argued that A.A.1's interview merely corroborated her trial testimony. While the corroboration may have been unfavorable to Pate, it was not unfairly prejudicial because even if A.A.1's interview had not been admitted, there was an abundance of other evidence presented at trial that corroborated A.A.1's testimony.

{¶ 83} Because A.A.1's and A.A.2's forensic interviews were admissible under the hearsay exceptions in Evid.R. 803(4) and Evid.R. 807(A), and because A.A.1's forensic interview was not prejudicially cumulative, Pate's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 84} Under his third assignment of error, Pate contends that his convictions for six counts of raping A.A.1 and four counts of raping A.A.2 were not supported by sufficient evidence and were against the manifest weight of the evidence.   We disagree.

{¶ 85} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).   "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt."   (Citations omitted.)   *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).   "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.)   *Id.*

{¶ 86} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12.   When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court

must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 87} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 88} As previously noted, Pate is challenging his convictions for six counts of raping A.A.1 and four counts of raping A.A.2. Each of the rape counts was in violation of R.C. 2907.02(A)(1)(b) and included a specification that the victim was less than 10 years of age. *See* R.C. 2907.02(B). Pursuant to R.C. 2907.02(A)(1)(b): "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 89} The term "sexual conduct" is defined as "vaginal intercourse between a

male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). " 'Fellatio is committed by touching the male sex organ with any part of the mouth.' " *State v. Hudson*, 2d Dist. Montgomery No. 22793, 2009-Ohio-2776, ¶ 42, quoting *State v. Long*, 64 Ohio App.3d 615, 618, 582 N.E.2d 626 (9th Dist.1989). "[C]unnilingus is completed by the placing of one's mouth on the female's genitals." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 86. Cunnilingus "generally refers to the act of licking to stimulate the vulva or clitoris with the lips or tongue." *State v. Gossard*, 2d Dist. Montgomery No. 19494, 2003-Ohio-3770, ¶ 14.

**{¶ 90}** Pate contends that there was insufficient evidence to support a finding that he engaged in sexual conduct with A.A.1 and A.A.2. The following evidence, however, established otherwise.

*Rape of A.A.1*

**{¶ 91}** During trial, A.A.1 referred to her vagina as her "private." A.A.1 testified that she used her private for "pottying" and indicated that it was located in her lap area. Trial Trans. Vol. IV, p. 639-640. A.A.1 also referred to Pate's penis as his "private," as she testified that boys use their private for "pottying" and indicated that a boy's private is located between his legs. *Id.* Using this terminology, A.A.1 testified to several incidents of cunnilingus, digital penetration, and fellatio. Each of those incidents are discussed in detail below.

1. Cunnilingus

{¶ 92} Three of the six counts of rape related to A.A.1 involved allegations of Pate performing cunnilingus.   In support of these counts, A.A.1 testified that Pate licked on her private in the "back room" and identified the "back room" as Pate's bedroom.   *Id.* at 635 and 646.   A.A.1 testified that when it happened, she would be lying on her belly on Pate's side of the bed with her clothes off.   *Id.* at 646-647.   A.A.1 also testified that when Pate licked her private it would be on her skin.   *Id.* at 646.   A.A.1 additionally testified that Pate licked on her private in the same manner while she was on the flower chair in Pate's front room/living room.   *Id.* at 643, 646-648.

{¶ 93} A.A.1 further testified that Pate licked on her private while she was in his van and truck.   *Id.* at 648-651.   A.A.1 testified that after Pate picked her up from school, he would drive her to the river where no one else was around.   *Id.* at 648-649.   A.A.1 testified that when they got to the river, Pate would get out of his vehicle, come around to the front-passenger seat where she was sitting, and "lick on [her] private."   *Id.* at 649-650.   A.A.1 testified that Pate instructed her how to put her legs up and once again indicated that when Pate licked on her private it would be on her skin.   *Id.* at 651-653.

{¶ 94} When viewed in a light most favorable to the State, the foregoing testimony was sufficient to establish at least three counts of rape by cunnilingus in violation of R.C. 2907.02(A)(1)(b).   The testimony established that Pate performed cunnilingus on A.A.1 on at least three separate occasions while: (1) in his bedroom, (2) in the living room and (3) inside his vehicle by the river.

2. Digital Penetration

{¶ 95} Two of the six counts of rape related to A.A.1 involved allegations of Pate's digitally penetrating A.A.1's vagina.   In support of these counts, A.A.1 testified that Pate

rubbed on her private using two of his fingers. Trial Trans. Vol. IV, p. 653. A.A.1 testified that Pate's fingers "would go in circles" on her skin. *Id.* At one point, A.A.1 testified that Pate only touched "outside" her body. *Id.* at 652. However, when A.A.1 was asked to demonstrate on a tissue box how Pate touched her with his fingers, the record indicates that A.A.1's fingers went slightly inside the tissue box during the demonstration. *Id.* at 654. A.A.1 testified that Pate did this type of touching "[i]n the living room, back room, van, and truck." *Id.* at 654. A.A.1 specifically recalled it happening in the living room while she was "sitting in [Pate's] lap." *Id.* at 654. A.A.1 testified that it would happen when they were sitting on "the flower chair" and on "the blue chair." *Id.* at 655. A.A.1 testified that it felt "weird." *Id.*

{¶ 96} The insertion, however slight, of any part of the body into the vaginal opening of another constitutes "sexual conduct" for purposes of establishing rape under R.C. 2907.02(A)(1)(b). R.C. 2907.01(A). Therefore, when viewed in a light most favorable to the State, we find that the foregoing testimony elicited from A.A.1 was sufficient to establish at least two counts of rape by digital penetration. Specifically, the testimony established that Pate digitally penetrated A.A.1 on two occasions in the living room, i.e. on the flower chair and on the blue chair. The testimony additionally established that Pate digitally penetrated A.A.1 while in his bedroom and vehicle. Accordingly, there was sufficient evidence of at least two instances of digital penetration. Pate's claim otherwise again lacks merit.

### 3. Fellatio

{¶ 97} The remaining count of rape related to A.A.1 involved an allegation that Pate made A.A.1 perform fellatio on him. In support of this count, A.A.1 testified that

Pate "would make [her] put [her] mouth on his private spot." Trial Trans. Vol. IV, p. 659. A.A.1 testified that Pate instructed her how to do it by showing her a video on his cell phone of "girls sucking on the boys' things." *Id.* at 659, 661. A.A.1 testified that Pate would put his private spot in her mouth while in the living room and in the back room. *Id.* at 660. A.A.1 specifically recalled an incident in the front room when "something white" came out of Pate's private spot after he put his private in her mouth. *Id.* A.A.1 testified that the white substance "squirted out" on the floor and that Pate said "it was juice." *Id.* at 660- 661.

**{¶ 98}** When viewed in a light most favorable to the State, the foregoing testimony was sufficient to establish one count of rape by fellatio in violation of R.C. 2907.02(A)(1)(b).

*Rape of A.A.2*

**{¶ 99}** As previously discussed, because five-year-old A.A.2 was found to be incompetent to testify at trial, a portion of A.A.2's forensic interview was played for the jury and admitted into evidence pursuant to Evid.R. 807(A). During the interview, A.A.2 initially only described Pate's abuse of A.A.1. However, A.A.2 eventually began to include herself in the abuse and described two instances of fellatio. In addition, A.A.1 provided testimony at trial indicating that she saw Pate perform cunnilingus on A.A.2. All of these incidents are discussed in detail below.

1. Fellatio

**{¶ 100}** Two of the four counts of rape related to A.A.2 involved allegations of fellatio. After telling the interviewer about how Pate touched A.A.1 with his genital area,

A.A.2 made the following unsolicited comment: "Him does it sometimes and we have to put it in [her] mouth." State's Exhibit 5(A), 4:55:08 p.m. to 4:55:56 p.m. When the interviewer clarified and asked A.A.2 if Pate did that to her, A.A.2 first shook her head no and then responded: "Yeah, but we say no all the time." *Id.* at 4:55:57 p.m. to 4:56:06 p.m. When the interviewer asked A.A.2 to tell her about Pate putting "his spot," i.e., his genitalia, in her mouth, A.A.2 indicated that Pate did it even though she did not want him to. *Id.* at 4:58:12 p.m. to 4:58:21 p.m. A.A.2 then said "We tell him to stop" and indicated that Pate stopped. *Id.* at 4:57:42 p.m. to 4:58:43 p.m. When the interviewer asked A.A.2 to clarify what the "thing" or "spot" was on Pate's body, A.A.2 said that Pate's thing was "in the middle." *Id.*

{¶ 101} The interviewer then asked A.A.2 where she was located when Pate puts his "thing" in her mouth and A.A.2 responded: "At Pawpaw and Mammaw's." *Id.* at 4:58:48 p.m. to 4:58:53 p.m. When asked where in Pawpaw and Mammaw's house, A.A.2 responded: "In their bedroom." *Id.* at 4:58:54 p.m. to 4:58:59 p.m. A.A.2 thereafter indicated that Pate only did it to her and A.A.1, not to A.A.3. *Id.* at 4:59:00 p.m. to 4:59:16 p.m.

{¶ 102} Later in the interview, A.A.2 indicated that Pate showed her pornographic videos. *Id.* at 5:06:37 p.m. to 5:07:11 p.m. When the interviewer asked what the people were doing in the videos, A.A.2 said "all these girls do this" and then A.A.2 physically imitated oral sex by opening her mouth and moving her head. *Id.* at 5:06:48 p.m. to 5:07:00 p.m. A.A.2 thereafter clarified that "they are doing it to the boy." *Id.* at 5:07:03 p.m. to 5:07:13 p.m. A.A.2 said that the people in the videos were "not kids they're grownups." *Id.* at 5:07:14 p.m. to 5:07:23 p.m. When asked how Pate showed her the

videos, A.A.2 said that "they were doing it on his phone." *Id.* at 5:07:45 p.m. to 5:08:06 p.m. A.A.2 also shook her head yes when the interviewer asked her whether Pate had ever made her do the things shown in the videos. *Id.* at 5:08:15 p.m. to 5:08:20 p.m.

**{¶ 103}** When viewed in a light most favorable to the State, the foregoing evidence was sufficient to establish two counts of rape by fellatio in violation of R.C. 2907.02(A)(1)(b). A.A.2's comments indicating that she said no to fellatio all the time and that Pate did it anyway suggested that Pate made her perform fellatio on more than one occasion. A.A.2 also specifically indicated that Pate made her perform fellatio in his bedroom. In addition, A.A.2's comments indicating that Pate showed her videos on his cell phone of females performing oral sex on males and how Pate made her do the things in the videos indicated a time that Pate made her perform fellatio on him while showing her a pornographic video on his cell phone. We further note that A.A.1 testified that she observed Pate do everything to A.A.2 that he did to her, and A.A.1 specifically testified that Pate would make her (A.A.1) perform fellatio in the living room and in his bedroom. Trial Trans. Vol. IV, p. 660 and 664-665. Based on the foregoing statements and testimony, we find that there was sufficient evidence in the record supporting at least two separate instances of fellatio involving A.A.2.

### 2. Cunnilingus

**{¶ 104}** The remaining two counts of rape related to A.A.2 involve allegations of cunnilingus. At trial, A.A.1 testified that she observed Pate lick A.A.2's private in the living room and his bedroom. Trial Trans. Vol. IV, p. 666-667. A.A.1 testified that this would happen after school and during sleepovers. *Id.* at 667. A.A.1 recalled a specific incident when this happened in the living room, as A.A.1 testified that A.A.2 was on her

belly leaning over the arm of the flower chair and Pate was sitting on the "rolling chair." *Id.* A.A.1 also testified that she recalled seeing Pate lick A.A.2's private in the back room while on his side of the bed. *Id.* at 667-668.

{¶ 105} Again, when viewed in a light most favorable to the State, the foregoing testimony was sufficient to establish two counts of rape by cunnilingus in violation of R.C. 2907.02(A)(1)(b). A.A.1's testimony sufficiently established that Pate performed cunnilingus on A.A.2 in his bedroom and living room.

{¶ 106} Based on all the foregoing evidence, the jury could have reasonably determined that Pate engaged in six incidents of sexual conduct with A.A.1, as well as four incidents of sexual conduct with A.A.2, thereby committing a total of ten counts of rape of a minor less than ten years of age in violation of R.C. 2907.02(A)(1)(b) and (B). In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Hunt*, 2d Dist. Darke No. 2018-CA-9, 2019-Ohio-2352, ¶ 24. After weighing all the evidence, including but not limited to the material discovered on Pate's cell phone, E.K.'s observations of Pate's interactions with the girls, and E.K.'s own allegations of abuse, we cannot say that the jury lost its way or created a manifest miscarriage of justice in believing A.A.1's and A.A.2's allegations of sexual abuse. Simply because the jury chose to believe A.A.1's and A.A.2's allegations did not mean that the verdict was against the manifest weight of the evidence. Therefore, in addition to being supported by sufficient evidence, Pate's convictions for six counts of raping A.A.1 and four counts of raping A.A.2 were not against the manifest weight of the evidence.

{¶ 107} Pate's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 108} Under his fourth assignment of error, Pate contends that the State committed prosecutorial misconduct by pursuing joinder of the offenses related to E.K. and A.A.1, A.A.2 and A.A.3.   Pate also contends that the State committed prosecutorial misconduct by presenting A.A.1's and A.A.2's forensic interviews, the blue vibrator found in Pate's residence, and E.K.'s corroborating accusations as evidence at trial.   We disagree.

{¶ 109} "When reviewing a claim of prosecutorial misconduct, our inquiry is twofold: we must first decide whether the prosecutor's actions were improper, and if so, we consider whether the conduct prejudicially affected the defendant's substantial rights." *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 115, citing *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 228.   " 'The touchstone of due process analysis * * * is the fairness of the trial, not the culpability of the prosecutor.' "   *Id.*, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).   "Thus, '[t]he relevant question is whether the prosecutors' [conduct] ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' "   *Id.*, quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).   "Where it is clear beyond a reasonable doubt that the trier of fact would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed."   *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 110, citing *State v. Underwood*,

2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21.

{¶ 110} With regard to joinder, pursuant to Crim.R. 8(A), the State was permitted to pursue joinder of the offenses in question. Therefore, contrary to Pate's claim otherwise, pursuing joinder was not improper. In so holding, we note that Pate has never argued that joinder was improper, as Pate conceded in the court below that these offenses were properly joined in a single indictment pursuant to Crim.R. 8(A). *See* Reply to State's Motion Contra Defendant's Motion to Sever (Sep. 24, 2019), p. 2. Pate instead filed a Crim.R. 14 motion to sever the offenses on grounds of prejudice, which, for the reasons discussed under Pate's first assignment of error, was properly denied by the trial court.

{¶ 111} As discussed under Pate's second assignment of error, it was also not improper for the State to present A.A.1's and A.A.2's forensic interviews as evidence at trial, as the interviews were admissible under Evid.R. 803(4) and Evid.R. 807(A). Even though portions of A.A.1's interview contained statements that did not fall under Evid.R. 803(4), and even though the statements in A.A.1's interview were cumulative to her trial testimony, as previously discussed, Pate was not unfairly prejudiced by those harmless errors.

{¶ 112} Concerning the blue vibrator, Pate asserts that the State knew A.A.1 would not recognize it as the one Pate used on her, yet asked her to identify a picture of it at trial anyway as a means to inflame the jury's emotions. There is, however, no indication on the record that the State knew A.A.1 would not recognize the blue vibrator. In any event, Pate was not prejudiced by the State's conduct because the fact that A.A.1 did not recognize the blue vibrator was beneficial to his defense. We cannot say that the State's

reference to the blue vibrator, which A.A.1 did not recognize, affected the jury's verdict.

{¶ 113} Finally, we also fail to see how it was improper for the State to admit evidence of E.K.'s corroborating allegations of sexual abuse at trial. E.K.'s allegations were admissible not only with respect to the offenses for which she was the victim, but also with respect to the offenses involving A.A.1, A.A.2, and A.A.3, as we have already determined that E.K.'s testimony regarding her abuse would be admissible as other-acts evidence under Evid.R. 404(B). Simply because E.K.'s testimony about Pate's sexual abuse tended to corroborate A.A.1's and A.A.2's allegations of sexual abuse did not make her testimony on that subject improper.

{¶ 114} Because the conduct challenged by Pate was not improper or prejudicial, Pate has not established a claim of prosecutorial misconduct. Therefore, his fourth assignment of error is overruled.


**Fifth Assignment of Error**

{¶ 115} Under his fifth assignment of error, Pate contends that the cumulative effect of all the errors in this case deprived him of a fair trial and warrants a reversal of his conviction. We again disagree.

{¶ 116} Under the doctrine of cumulative error, "[s]eparately harmless errors may violate a defendant's right to a fair trial when the errors are considered together." *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 40, citing *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). "In order to find cumulative error, we first must find that multiple errors were committed at trial." *Id.* "A conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even

though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 117} In this case, the only harmless errors committed at trial were that portions of A.A.1's forensic interview were admitted into evidence despite being cumulative and despite the interview's containing hearsay statements that did not fall under the medical diagnosis or treatment hearsay exception in Evid.R. 803(4). After considering these few harmless errors together, we do not find that they were so pervasive as to deprive Pate of a fair trial. Accordingly, there is no cause for reversal under the doctrine of cumulative error.

{¶ 118} Pate's fifth assignment of error is overruled.

### Conclusion

{¶ 119} Having overruled all five assignments of error raised by Pate, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Johnna M. Shia
Hon. Mary Lynn Wiseman